UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

JEFFREY HAMM,                      :
                                   :
                    Plaintiff,     :
                                   :                **OPINION AND ORDER**
      - against -                  :                05 Civ. 503 (ER)
                                   :
RICHARD HATCHER, and CITY OF NEW   :
YORK,                              :
                                   :
                    Defendants.    :

———————————————————————x

Appearances:

Jeffery Hamm
East Elmhurst, NY
*Pro Se Plaintiff*

Kimberly D. Conway, Esq.
New York City Law Department, Office of the Corporation Counsel
New York, NY
*Counsel for Defendants*

Ramos, D.J.:

     *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

---

[1] Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

## I. Background

### A.  Undisputed Facts

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2]  (Conway Decl. Ex. F ("Hamm Dep.") 9:19-23, 31:15-21, 36:24-37:6.)  After serving in the military from 1980-1982, (*id.* 10:24-11:2, 35:2-8), Plaintiff and his ex-wife divorced.  (*Id.* 35:15-17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20-10:2, 10:24-11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology.  (*Id.* 10:4-8.)  In December of 2001, on his second day of college, Plaintiff was arrested and released.  (*Id.*  11:24-12:2, 13:12-14.)  He struggled with substance abuse at that time, and continued to relapse into early 2002.  (*Id.* 11:7-17.)

Plaintiff was again arrested in March 2002.  (*Id.* 13:15-17.)  He was immediately taken into custody at the Manhattan Detention Center.  (*Id.* 13:18-25.)  On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone.  (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.)  Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22-16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

---

[2] Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times.  (Hamm Dep. 36:24-37:3.)  Most of his arrests have been for the possession or sale of marijuana.  (*Id.* 37:4-6.)

[3] Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when.  (Hamm Dep. 16:8-9.)  He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10-14.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5]  (*Id.* 14:11, 21-25.)  After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22-15:2).  On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.)   Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits.  (*Id.* at 1, 2.)  On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga-Anan, M.D. ("Caga-Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others.  (Conway Decl, Ex. B at 1.)   Caga-Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax.  (*Id.*)  Both prescriptions were to last for fourteen days.  (*Id.*, Ex. C.)

On August 22, 2012, Garden and Caga-Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.)  They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with depressed mood.  (*Id.* at 1.)  They again directed that he was to undergo biweekly clinician and psychiatrist visits.  (*Id.* at 2.)  On August 28, 2002, Caga-Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily.  (*Id.*, Ex. C.)  Caga-Anan discontinued Plaintiff's Atarax

---

[4] Plaintiff refers to this detention facility as the "Beacon facility."  (Hamm Dep. 14:1-4.)

[5] The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers.  (Hamm Dep. 14:11, 24-25.)

prescription.  (*Id.*)  Again, both prescriptions were to last Plaintiff for fourteen days—until September 11, 2002.[6]  (*Id.*)

**B.  Facts in Dispute**

In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island.  (Hamm Dep. at 15:18-21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

**1. Defendant's Version of Facts**

Defendants assert that on September 12, 2002—the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC.  (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time.  On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker.  (*Id.*)  Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression.  (*Id.*, Ex. I.)   There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage."  (*Id.*, Ex. J.)  On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC.  (Conway

---

[6] Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13-17.)

[7] Hatcher's position is unclear from the record.  According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP."  (Conway Decl., Exs. K, L.)  However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher."  (*E.g.* Hamm Dep. 17:16.)

Decl., Ex. K.)  Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications, " and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed."  (*Id.*)  However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia.  (*Id.*)  Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.'"  (*Id.*)

Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep.  (*Id.*)  Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.*, Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days.  (*Id.*)  Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002—a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again.  (*Id.*, Ex. N.)  A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor.  (*Id.*)  Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003.  (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

### 2. Plaintiff's Version of Facts[8]

Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions.  (*Id.* 17:21-25, 22:2-7.)  Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication.[9] (*Id.* 17:16-18, 22:2-13.)

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal."  (Hamm Dep. 23:2-4.)  These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts.  (*Id.* 23:5-16.)  He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication[10]—including filing a grievance at GMDC, (*id.* 41:23-42:8, 42:22-43:4; TAC at 4)—but that he remained without his medication for the duration of his first ten days there.  (Hamm Dep. 23:17-24:2, 24:10-11.)  When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone.  (*Id.* 18:1-3, 28:1-8.)  Hatcher later prescribed Risperidone to Plaintiff for impulse control.  (*Id.* 29:4-8.)

---

[8] As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

[9] Plaintiff's evidence regarding the time during which he went without his medication is inconsistent.  In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher.  (Pl.'s Mem. second unnumbered page.)  He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment.  (*Id.*)  The Court discusses these inconsistencies below.  *See infra* n.13.

[10] Plaintiff's testimony is also inconsistent in this regard.  For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated.  (Hamm Dep. 25:25-26:3, 26:22-25, 27:17-19.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications.  (*Id.* 19:10-14, 21:13-22, 24:8-19.)  He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing.  (*Id.* 21:21-22:1, 24:8-19.)

### 3. The Criminal Prosecution of Plaintiff

Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years imprisonment.   (First Unnumbered Exhibit to Second Amended Complaint ("SAC")at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication.  (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the denial of Plaintiff's motion on April 5, 2005.  (First Unnumbered Exhibit to SAC at 12-13). In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication."  (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea.  (*Id.*)    On June 18,

2005, The Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

## II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the Southern District of New York on January 14, 2005. (Doc. 1.) Then-Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint.[11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs. 61, 63.)

---

[11] In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

## III. Applicable Legal Standards

### A. Summary Judgment

Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp.*, 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya*, *Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley*, *Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts.  *Senno*, 812 F. Supp. 2d at 467.  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256–57 (1986)).

### B.  Local Rule 56.1 and *Pro Se* Litigants

Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed. R. Civ. P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local R. 56.1(a).  In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.  Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P.

10

56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[p]*ro se* litigants are then not excused from meeting the requirements of Local Rule 56.1." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear Co. v. 1-800-BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied*, 130 S. Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs. 63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where

11

actually supported by evidentiary submissions." *Wali*, 678 F. Supp. 2d at 178 (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).   Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).   The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.*, 39 F. Supp. 2d 251, 257 (E.D.N.Y. 1999), as well as the unsworn statements in his opposition papers—but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 603 n.1 (S.D.N.Y. 2004).   However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga*, 51 F.3d at 18.

## IV. Discussion

### A.  Plaintiff's Claim Against Hatcher

#### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment.   U.S. Const. amend. VIII.   A prisoner's Eighth

Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant*, 101 F.3d at 856; *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g.*, *Mitchell v. Prison Health Services, Inc.*, 07 Civ. 8267 (PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord*, 467

F.3d 263, 279-80 (2d Cir. 2006).  An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer*, 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency . . . that may produce death, degeneration, or extreme pain" is present.  *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks, brackets, and citation omitted).

Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citing *Wilson*, 501 U.S. at 298).  An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the prisoner's underlying medical condition.  *Bellotto v. Cnty. of Orange*, 248

F. App'x 232, 236 (2d Cir. 2007) (citing *Smith*, 316 F.3d at 184-86.)  Alternatively, when—as in

the instant case—a prisoner alleges a temporary delay or interruption in the provision of

otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin*, 467

F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption

in treatment rather than the severity of the prisoner's underlying medical condition.  *Id.* (citing

*Smith*, 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188-89

(11th Cir. 1994) (explaining that the seriousness of a delay in medical treatment may be decided

"by reference to the *effect* of delay in treatment. . . . [considering] the seriousness of the medical

need [and] deciding whether the delay worsened the medical condition") (emphasis in original)).

In the latter scenario, the court must examine all relevant facts and circumstances when

determining whether a delay in treatment is sufficiently serious.  *DiChiara v. Wright*, 06 Civ.

6123 (KAM) (LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith*, 316 F.3d

at 187).   Accordingly, because Plaintiff's claim against Hatcher is based on a short-term

interruption in the treatment that is otherwise unchallenged,[12] the court must focus on the risk of

harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently

serious.

 "Courts have repeatedly held that treatment of a psychiatric or psychological condition

may present a serious medical need."  *Cuoco*, 222 F.3d at 106 (internal quotation marks and

citation omitted).  It is also true that "[f]requently missed doses [of medication] could readily

result in adverse medical events." *Mastroianni v. Reilly*, 602 F. Supp. 2d 425, 438 (E.D.N.Y.

2009).  Such a delay or interruption in treatment, however, only gives rise to a violation of a

prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or

---

[12] To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas.  *See supra* n.11.

safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002).  Although adverse medical effects are not required to prove a constitutional violation, "the absence of  . . . physical injury will often be probative,"  and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  *Smith*, 316 F.3d at 187, 188.

Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC.  (TAC at 3; Hamm Dep. 18:20-25.)  He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13]   (TAC at 3; Hamm Dep. 17:21-25, 21:13-15, 22:2-7.)   Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy.  However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

---

[13] As noted above, *see supra* n.9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent.  First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there.  In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC—with no mention of a prison policy—Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony.  *Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 407 (W.D.N.Y. 2010) *aff'd*, 660 F.3d 98 (2d Cir. 2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528-529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.*, and unsupported by admissible evidence, *see Wali*, 678 F. Supp. 2d at 178 (citing *Holtz*, 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants.  *See Celotex Corp.*, 477 U.S. at 322.  However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts.  (Hamm Dep. 23:1-4, 6-16.)   Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm.[14]  Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here.  *Bellotto*, 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress);     *Barnard v. Beckstrom*, No. 07-CV-19, 2008 WL 4280007, at *16 (E.D. Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing*, No. 00-CV-1319, 2006 WL 2796637, at *11 (C.D. Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White*, 10-4594-PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably . . . serious underlying conditions"—but failed to demonstrate that his condition

---

[14] Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding."  *Pellum v. Burtt*, 9:05-3339-JFA-GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn*, 896 F.2d 848, 852 (4th Cir.1990)).

worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith*, 316 F.3d at 181-82 (two separate delays of several days each in provision of medication to inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N.Y. State Corr. Dept. of Health Servs.*, No. 99-0066, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway*, 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.*, 726 F. Supp. 2d 183, 191-92 (D. Conn. 2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need).  The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding.   *Smith*, 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese*, 694 F. Supp. 2d 137, 159 (N.D.N.Y. 2010) *aff'd*, 415 F. App'x 313 (2d Cir. 2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference.  As discussed above, *see supra* Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs."  *Chance*, 143 F.3d at 703 (citing *Farmer*, 511 U.S. at 837).  "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm.  *Salahuddin*, 467 F.3d at 280.  Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin*, 467 F.3d at 280; *Hathaway*, 37 F.3d at 68.  Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher.  (Hamm Dep. 19:10-15.)  Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated.  (Hamm Dep. 21:18-22:1, 24:8-21.)

Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell*." *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court is respectfully directed to terminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.


It is SO ORDERED.


Dated:     January 7, 2013
           White Plains, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.